### Case No. 7,425.

JOHNSTON et al. v. CHARLOTTESVILLE NAT. BANK.

[3 Hughes, 657; 25 Int. Rev. Rec. 385; 2 Browne, Nat. Bank Cas. 199; 14 Am. Law Rev. 86.] [1]

Circuit Court, W. D. Virginia. Fall Term, 1879.

William A. Fisher, for plaintiff.
Charles Case, for defendant.

BOND, Circuit Judge. This cause having been submitted to the court by writing duly

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 14 Am. Law Rev. 86, contains only a partial report.]

executed and filed, waiving the intervention of a jury, as well upon the facts as upon the law, and having been argued by counsel, the court doth find the facts to be as follows:

Johnston Brothers & Co., the plaintiffs, claim to recover against the defendant, the Charlottesville National Bank, upon five bills of exchange in their declaration mentioned. The partners constituting the firm of Johnston Brothers & Co. are citizens of the state of Maryland, and are bankers in the city of Baltimore. The defendant bank was, on the 16th of April, 1875, a banking association and body corporate carrying on the business of banking at Charlottesville in the state of Virginia, under the provisions of the act of congress known as the "National Bank Act" [13 Stat. 99]. N. H. Massie was a director and president of the defendant bank. B. C. Flanagan, of the firm of B. C. Flanagan & Son, was also a director, and W. W. Flanagan, also of that firm, was a director and cashier of the bank. Each continued his official relations to the bank until its failure, which occurred about the 28th of October, 1875, when the bank went into the hands of a receiver, in whose hands it now remains. Prior to the 13th day of April, 1875, the bank had, at sundry times, discounted paper for the Flanagans to an amount aggregating more than $50,000, which paper at the date first above mentioned had not matured, but much of this paper had been re-discounted for the use of the Bank of Charlottesville by other banks in New York and Baltimore. Flanagan & Son were in straitened circumstances on the 13th day of April, 1875, and, though in possession of sundry and numerous bills receivable, they were drawn payable upon such long time that they were available only as collaterals, and not for the purpose of present discount in bank. They also had certain bonds designated as "Jordan Alum Springs" bonds. The Flanagans applied to the defendant bank for a loan of $25,000, but the bank declined to make such loan, because it was out of funds to do so. On the 13th April, 1875, Flanagan & Son applied to the plaintiff for a loan of $25,000, stating they might have got it from the defendant bank, but it was not in funds. The plaintiffs required them to submit their proposition in writing, which they did in the words following:

"We propose to borrow $25,000 until next fall, say November 20th, and to pledge as collateral for same, say $30,000 bills receivable, $25,000 Jordan Alum Springs ten per cent. bonds. The bills receivable above are given to us for guano and provisions furnished merchants by us, and in many cases are secured to us by a pledge as collateral of planter liens, and indorsed by Flanagan, Abell & Co. The Springs bonds are secured by a first mortgage on all the property, both real and personal. The cost of said property is $150,000, and the amount of the mortgage is $60,000. The bonds bear ten per cent. J. Ran. Tucker and John B. Minor are trustees, and the mortgage can be foreclosed on failure to pay interest. We will give our note for same and interest, but will wish any notes which are held as collateral and maturing before maturity of above loan to be credited on same, with rebate of interest. As an alternative, if preferred by you, we believe, by depositing the Springs bonds with the Charlottesville National Bank, we can give its indorsement. It is proper, however, to state the proposition is contingent on the bank's willingness to indorse, which has not been submitted to the directors thereof."

The plaintiffs then took the written proposition under advisement, promising to give notice of its acceptance or non-acceptance in due time and, accordingly, on the 14th April, 1875, the plaintiffs addressed to Flanagan & Son the following letter:

"Baltimore, April 14th, 1875. Messrs. B. C. Flanagan & Son, Charlottesville, Va.— Dear Sirs: In reply to the memorandum handed us yesterday, we have to say, that we will advance you twenty thousand dollars on the following collaterals: Forty thousand dollars of bills receivable from new and fresh sales of this season (no renewals of old paper to be included), and four drafts of five thousand dollars each of the Charlottesville National Bank on the Citizens' National Bank of this city, payable on the 30th of November next, 'acceptance waived.' said drafts to be received by us in lieu of the Jordan Alum Springs bonds, which are to be deposited by you with the bank as security for these drafts as above. You forgot to mention in your memorandum the rate of interest and commissions you were willing to pay. If this be made satisfactory, we will make the advance as herein stated. Perhaps you had better come down in person to conclude the arrangement. Respectfully, Johnston Brothers & Co."

Upon receipt of this letter, on the 16th day of April, 1875, B. C. Flanagan requested Massie, the president of Charlottesville Bank to sign and issue drafts, that they might use them as collateral security, in part, for the loan from plaintiffs, with which request Massie, the president, on the 16th of April, 1875, complied, without submitting the matter at any time to the board of directors of the bank; but he required that Flanagan & Son should submit to him a written proposition for the loan, which they did in the following words:

"To N. H. Massie, President Charlottesville National Bank: We are greatly in want of certain accommodations to extend some liabilities of our firm until next autumn, and, if we can procure them through the aid of this bank, will be enabled then to meet them without, we are persuaded, any doubt, and are able to cover the amount by

collateral security in the shape of good business paper not maturing early enough for our present purposes, but of unquestionable solvency and reliability. It is, of course, not worth our while to say to you that our liability in many different ways to the bank, incurred through a course of years in the two banks before their consolidation, partly as principal and partly as indorser, we being ourselves individually the owner of a very large part of the stock of both banks, is of such an amount that even the most temporary disaster to us would seriously inconvenience the present bank, even to use no stronger language. What we ask now is aid to the extent of five drafts extending till November, amounting in the aggregate to twenty-five thousand dollars."

Having obtained the bills of exchange, Flanagan & Sons, on the 17th of April, called on the plaintiffs at Baltimore, and obtained from them the loan of $25,000, giving the plaintiffs their promissory note, payable on the 30th of November then next, for the amount of the loan, and interest added, at the rate of eighteen per centum per annum, amounting to the sum of $27,912.50; and as collateral security indorsed and delivered to the plaintiffs said five bills of exchange, and transferred bills receivable to the amount of $26,106.24, which last amount they increased to $46,000 in a month thereafter. The plaintiffs were aware at the time they received them that at the time of drawing those bills the bank had no funds with which to make discounts, and that, however obtained from Massie, they were to be used by Flanagan & Son as collateral security for the loan made by them. The plaintiffs were not aware of the arrangements made with Massie by Flanagan & Son to obtain the five bills, except so far as is above stated, and by the correspondence between Flanagan and the plaintiffs, and in the application of the 13th April, 1875, made by Flanagan & Son for a loan. On the 16th day of April, 1875, the Citizens' National Bank of Baltimore, upon which the five drafts were drawn, was and had been the correspondent bank and reserve redemption agent of the Charlottesville National Bank, keeping two accounts with it: one general account as its correspondent, and another account exclusively pertaining to its redemption agency; and the reserve fund of the Charlottesville Bank remaining in the Citizens' Bank. On the 16th of April, the date of the drafts, there was to the credit of the Charlottesville Bank in the Citizens' Bank, on its reserve account, a balance of $15,000, but at the same time the Charlottesville Bank owed the Citizens' Bank upon general account, $14,088.84, which indebtedness was increased on the 17th of April, 1875, to $15,337.35; the reserve account remaining as it was.

The bills of exchange were drawn by the Bank of Charlottesville on the Citizens' National Bank of Baltimore, each payable to the order of B. C. Flanagan & Son, the first payable on the 20th of November, "fixed"; the second and third were drawn payable on the 25th and 30th days of November, "fixed"; and the fourth and fifth were drawn payable on the 6th and 10th days of Dec., "fixed"; and each of said bills was drawn and expressed, "acceptance waived." The word "fixed" in said bills means without grace. Neither of the bills was paid at maturity, though presented, and due notice of protest was sent to drawer and indorser. When the money was obtained from the plaintiffs by the Flanagans, it was deposited in the Bank of Charlottesville subject to the order of Flanagan & Son. Neither of said bills was drawn against money actually on deposit to the credit of the Bank of Charlottesville in the Citizens' Bank, nor upon any money thereafter to become due from the Citizens' Bank to the Bank of Charlottesville, upon the maturity of said bills. It was expected by the plaintiffs and the Charlottesville Bank and Flanagan & Son that the latter would protect the drawer from any liability upon the bill by paying their note given to the plaintiffs, as above stated, when the same matured. And the court finds, further, that it is not in the ordinary course of business, or usual with national banks, to draw time bills of exchange upon each other without grace, acceptance waived. And the court finds as matter of law that upon these facts the issuing of the bills of exchange in question was not a discount, because the Bank of Charlottesville had no funds with which to discount paper presented for discount, but that it was merely a loan of the bank's credit to Flanagan & Son. And it further finds that the plaintiffs, knowing the said drafts or bills of exchange were issued to the Flanagans as collateral security, and that they were drawn for that purpose, it makes no difference whether the same were given to Flanagan & Son for a note deposited by them with the bank at the time, secured by the collateral security, or not: the said drafts were but the accommodation paper of the Bank of Charlottesville, and as such were void in the hands of the plaintiffs, who took them with such knowledge of their character. And the judgment is given for the defendant with his costs.